## McCARTNEY, ET AL. V. CALHOUN, ET AL.

1. The courts of ordinary of the State of Georgia, being courts of limited,
and special jurisdiction, have no power to order the sale of the slaves of
an intestate, unless the administrator make the representation, which the
statute requires.  This must appear from the record; and if it does not,
the court was without jurisdiction and the sale void.
2. It is error in the chancellor to direct the master to take an account, and
after ascertaining the amount due the complainant, to apportion it among
the several defendants, and if they do not pay on request, to issue execu-
tion.
3. Where one is administrator of two estates, a claim may be asserted in
the same bill, against both, if all the defendants are equally interested in
the question.  It is not necessary their interest should be joint.  It is suf-
ficient if it is common to, or concerns them all.

Error to the Chancery Court of Talladega.

THE bill was originally filed on behalf of the defendant in
error, an infant.   The case made by the original, amended
and supplemental bills, may be thus briefly stated:   David
Calhoun, the father of complainant, died in Franklin county,
Georgia, some time in 1826, leaving a widow, and two sons,
the complainant and his brother John C., and a considerable
property in land, slaves, and other property, and unembarras-

sed, or owing but little. Matilda, the widow, and one William King, administered on the estate, and possessed themselves of it. Afterwards, the widow intermarried with King. By the law of Georgia, an administrator cannot sell the slaves belonging to his intestate, unless the other personal property, together with the hire of the slaves for one year, is insufficient for the payment of the debts; and that by the law of that State, a purchase made by an administrator at his own sale is fraudulent and void. That without any necessity therefor, the administrator, King, fraudulently procured an order for the sale of the slaves from the court of ordinary, and fraudulently sold, a man, a woman, and her three male children, and also a fourth born after the order of sale was made, and purchased the slaves himself, at the inadequate price of $1,020.

That complainants further left real estate worth $4,000, which King, without any order of the court for that purpose, exchanged for other land and negroes, taking the titles in his own name, and appropriating them to his own use, and has never accounted with the orphans' court in Georgia, for the sale of either the land or slaves, which proceeding in regard to the land, as well as slaves, was wholly unauthorized by the law of Georgia. That King induced his wife to consent to this course, by representing to her that it would be more convenient to have the slaves under their own control, than to hire them out from year to year, but fraudulently represented to the court of ordinary, that their sale was necessary to pay the debts of the deceased.

That the surety of King in his official bond, was only bound in the penal sum of $2,000, and has since become wholly insolvent.

That King subsequently removed from the State of Georgia, bringing with him the slaves and other personal property of complainant's father, and complainant, and his brother John C. That King afterwards died, leaving his wife and John C. Calhoun, his executrix and executor. That John C. Calhoun, although he well knew that King had never paid for the slaves in his possession, and that they were not the property of King's estate, sold them as such, as the executor of King, purchased them himself, but never paid any thing

for them.    That John C. Calhoun has also departed this life intestate, and unmarried, and that Solomon Spence, in virtue of his office of sheriff of Talladega, and as successor of David A. Griffin, sheriff, became his administrator, and claims the slaves as his property.    That they are now twelve in number, and are all in possession of said Spence, who is treating them as the property of said King, and John C. Calhoun.    That both King, and John C. Calhoun, were much indebted, and that Spence is permitting the estate of David Calhoun, to be applied to the payment of the debts of King, and in particular has permitted three of the slaves to be levied on as the property of King, by Baker, Sprouls & Co.

That the twelve slaves, are all the property now remaining of his father's estate, of which estate he is entitled to two-thirds, as the heir of his father, and brother, and that the whole is insufficient to meet his just demands.

The prayer of the bill is for an injunction for general relief, &c.

The chancellor dismissed this bill for want of equity, which decree on writ of error to this court was reversed, and the cause remanded.    [5 Ala. 528.]

Upon the return of the cause to the chancery court, the complainant filed a supplemental bill, alledging that he was unable to give the security required as the condition upon which an appeal was granted when his bill was dismissed. That after the time for taking an appeal expired, one William McLane, coroner of Talladega county, who had previously levied on two of the slaves by virtue of a *fi. fa.* against King, proceeded to sell the slaves so levied on, to wit, Isaac and Green, and that one Baker Dulaney purchased Isaac, and not long after sold him to one David McCulloch; and that Green was purchased by one George Williamson, all of whom had actual notice of complainant's claim.

That McLane not long afterwards levied on the residue of said slaves, viz., Mike, Candice, and her child Harriet, Mike, Jr., Elize, Nathan, Bob, Leah, and Adeline, under or by virtue of one or more *fi. fas.* in favor of Councel McCartney, and on the .... day of .... 1842, sold the same at public outcry, McCartney becoming the purchaser, with full notice of complainant's claim.

The bill also alledges that McLane had full notice of complainant's claim, and that the sale was forbidden by an agent of complainant. All these persons are made parties to the bill.

Spence answered, and denies all knowledge of the transactions in Georgia, and calls for proof, and relies upon the fact that King brought the property to this State, and retained it as his own for two years, contracting debts on the faith of it, and pleads the statute of limitations. Admits that he was appointed administrator *de bonis non* of the estate of William King, and also administrator of the estate of J. C. Calhoun. Admits the levy and sale of two of the slaves as the property of King, to pay the debt of Baker, Sprouls & Co., which execution issued against King's executors. Admits the purchase by J. C. Calhoun at his own sale as executor, of the slaves in controversy. He further states, that he forbade the sale under McCartney's execution, and gave notice that he should be compelled to sue for them as the administrator of J. C. Calhoun. Admits that J. C. Calhoun has not paid any thing for the slaves, but insists that the sale was fair and *bona fide*.

McLane denies all knowledge of the matters said to have taken place in Georgia. Admits that he sold the slaves as coroner, the sheriff being interested upon executions against King's estate, as stated in the bill, and that the slaves were purchased by the persons there stated. Calls for proof of the allegations of the bill, and demurs, &c.

McCartney, and others, the purchasers of the slaves, admit the facts relating to their purchase of the slaves as the property of King's estate under execution, and deny generally all knowledge of the other facts stated in the bill, and call for proof and demur to the bill.

Mrs. King also answered the bill, admitting many of the charges relating to the transactions in Georgia, but as her answer exerts no influence over the rights of others, it is unnecessary to state it further.

The evidence in the cause, will be seen in the opinion of the court, so far as it is necessary to the understanding of the cause.

15

The chancellor, after disposing of some preliminary objections, proceeded to consider the cause on its merits, and held that the court of ordinary in Georgia, had no jurisdiction to order a sale of the slaves of David Calhoun, deceased, under the statutory provisions of that State. That therefore the sale, and the pretended purchase by King, was a nullity, and that the slaves still continued subject to distribution. That the complainant was entitled to one-third part of the slaves and their increase, but could not claim as the heir of his brother, who by his own act had estopped himself from asserting such a claim; and the fact, that the slaves were now in the hands of purchasers for a valuable consideration, who had notice of the claim, both actual and constructive, could not impair his right to charge the property in their hands, with the payment of his portion.

He also directed the master to take an account of the number and value of the slaves, with their increase to the time of such account; and also the value of the hire of the slaves annually from the 5th March, 1827, up to the time of stating said account. That he also report what sum per annum the complainant should pay King for board, clothing and education, with interest as above. To inquire which of the slaves was purchased by each of the defendants, with the value of each slave, and the increase of the females, if any. That one-third part of the sum so ascertained, shall constitute the distributive share of complainant, subject to a deduction for board, clothing, &c., and that he pay the same to the guardian of complainant, if he be still in his non-age, or to the complainant, if he be of full age.

That when the sum shall be ascertained, he shall apportion the same to the different defendants who purchased the slaves, according to the value of the slaves so purchased. That he give each of them notice to pay the same in thirty days, and on their failing to do so, that execution issue. Costs were decreed against the defendants.

W. P. CHILTON and S. F. RICE, for plaintiff in error, made the following points:

1. The bill is multifarious, and joins Dulaney and Williamson purchasers of two negroes, with McCartney the pur-

chaser of others, each of whom purchased under distinct judgments, and who have not the slightest identity of interest. [Kennedy's heirs and ex'rs v. Kennedy, 2 Al. R. 609; Mecham v. Goodwin, McKee, et al. last Term.

.2. The decree is erroneous, as it directs execution to issue upon a finding of the master, which the court should supervise and decide upon. [Farmer v. Arnold, 4 Littel, 192, 193; Terrell v. Arnold, ibid, 302; Jarman v. Davis, 4 Mon. 118; Griffin v. Depew, 3 Mar. 180; 5 ibid, 249; Payne v. Wallace, 6 ibid, 383.]

3. The court, by decreeing the master's report final in advance, denies the defendants the right of exception.

4. King, the testator, bought the negroes in Georgia under an order of the court of ordinary of that State. He has the same right to buy there that he has here—the common law right.

5. The order of the orphans' court of Georgia for the sale of the slaves, however irregular, cannot be collaterally impeached, and is good until impeached upon a direct proceeding. [Doe ex dem. Duval's heirs v. McLosky, 1 Al. R. 731; Perkins' ex'rs &c. v. Withers, 7 Ala. R. 855; Eslava v. Elliott, adm'r, 5 ibid, 264.]

6. No fraud is alledged in the sale to King; he bids a reasonable price; charges himself with the amount bid, and proceeds to pay off debts due from the estate of David Calhoun. The court, before setting aside the contract, should place him in *statu quo.*

7. The estates of King and J. C. Calhoun both having been reported insolvent, the creditors of both estates should be made parties, having a direct interest in this fund.

8. The decree is erroneous as against the purchasers, charging them with the hire of the slaves for some eighteen years before they ever had any thing to do with them, and interest on the hire.

9. Besides, the purchasers should have had the privilege of surrendering the slaves and accounting for their hire for the time they had them.

A. WHITE and PARSONS, contra.

The proof in this case, together with the statute of Geor-

gia, shows that King had no right to sell the slaves the subject of controversy. [Prince's Dig. 233, 234, § 2.] The proof shows conclusively that there was no need of selling to pay the debts, and the appraisement bill shows that an equal division of the slaves could have been made, each of them being entitled to an equal share. [See Prince's Digest, 233, § 42.]

The court of ordinary had no jurisdiction. No notice was given to the distributees or their guardians, as required by law. [Prince's Digest, 233, 234.]

The records of a court of limited jurisdiction should show every necessary to the validity of its sentences. [Lester v. Vivian, and others, 8 Por. 375.]

Executors and administrators, in making sales of property, must strictly comply with all statutory provisions on the subject, and unless every essential direction is complied with, all whose interests are affected will not be precluded thereby. [Ventress v. Smith, 10 Porter, 175; Monroe v. James, 4 Munford, 200; Knox, et al. v. Jenks, 7 Mass. 492; Wiley and Gayle v. White and Lester, 3 S. & P. 3 58.] And although this rule may be somewhat relaxed, as in the cases of Wyman v. Campbell, 6 Por. 219; Couch and Robinson v. Campbell, and others, ibid, 262; Doe ex dem. Duval's heirs v. McLoskey, 1 Ala. Rep. N. S. 708, and in case of Jennings v. Jenkins' adm'rs, 9 Ala. Rep. 285, in favor of *bona fide* purchasers; yet it is conceded it will operate with full force against an administrator who is a purchaser at his own sale.

An administrator is held to the utmost fairness in purchases at his own sale, and as a sequence must sell with a view to the interests of his *cestui que trusts* and not his own. [McLane v. Spence, 6 Ala. Rep. 894.]

The common law is in force in Georgia, except when changed or abrogated by the Legislature. [Prince's Digest, 570, § 3.] § 1. And in the absence of proof to the contrary, will be presumed to be the rule of decision in a sister State. [Mims v. Bank of Geo. 2 Ala. Rep. 204; Shephard v. Nabors, 6 Ala. Rep. 631.] And by the common law an administrator or executor could not purchase at his own sale. [*Ex parte* James, 8 Vesey, 347; Lister v. Lister, 6 Vesey, 631;

*ex parte* Bennett, 10 Vesey, 393; Whale v. Booth, 7 Term Rep. note a; McLeod v. Drummond, 17 Vesey, 168; Campbell v. Walker, 5 Vesey, 680.]

The chancery court of this State has jurisdiction though administration was taken out in Georgia. [Calhoun, by his next friend, v. King, and others, 5 Ala. R. 523; Williamson v. Branch Bank at Mobile, 7 Ala. Rep. 906 ; Julian, and others, v. Reynolds, and others, 8 Ala. Rep. 680.]

Complainant is entitled to an equal share in the estate with his mother and brother. [Prince's Digest, 233, § 42, sec. 5.]

Complainant's demand by the laws of Georgia would be entitled to satisfaction before any other debt of King out of the proceeds of his estate. [Prince's Dig. 233, § 41, sec. 5.]

Distribution of an estate must be had according to the law of the place where the administration was granted, and the payment of debts made in the same manner as though the remedy was sought at the place of appointment. [McNamara v. Duzer, 7 Paige's Rep. 239.]

The objections to the depositions should have been brought up by a motion to suppress, and upon notice, [Barbour's Ch. Pr. vol. 1, 316,] and is not revisable. [Cullum v. Smith and Conklin, 6 Ala. Rep. 626.]

As to when and what interest an administrator or executor is chargeable with, see T. & J. Kirkman, and others, v. Vanleer, 7 Ala. Rep. 230, 231; Granberry v. Granberry, 1 Wash. 246; Cavendish v. Fleming, 3 Munford, 198; Beeson v. Bruce, 4 Dess. 463.]

ORMOND, J.—The principal question in the cause is, whether William King, the administrator of David Calhoun, in the State of Georgia, acquired a title to the slaves, Mike, Candice and their children, by his purchase at his own sale, made in that State in the year 1828. If the sale was wholly unauthorized, the purchase by him was a nullity; but if the court of ordinary, in Georgia, had jurisdiction of the subject, and could therefore have directed the sale of the slaves, no matter how irregular its action may have been, the proceeding is not void, but voidable merely, and the title acquired by a purchaser at such an irregular sale, will be good

until the order is reversed by a direct proceeding, having that for its object. The law was so held by this court, on great consideration, in the case of Campbell v. Wyman, 6 Porter, 219, and Couch v. Robinson and Campbell, ib. 262. The principles there determined, have been repeatedly recognized since, and must now be considered the settled law of this court.

To ascertain whether the court of ordinary in Georgia, acquired jurisdiction, we must look to the statute conferring the power, which is as follows: "No administrator shall be allowed to sell any slave or slaves, belonging to the estate of his intestate, but where the other personal estate, together with the hire of each slave, or slaves for twelve months, shall be insufficient to discharge the debts due by the estate; or where one or more slaves shall be subject to distribution, and an equal division thereof cannot be made in kind, it shall be lawful for the court of ordinary, by which administration was granted, to direct the sale of such slave or slaves. Provided always, that such distributee, or his, her, or their guardian, shall receive twenty days notice in writing, previous to the granting of such order, to show cause if any he or they can, against such sale." [Prince's Dig. 234, § 45.]

We are not advised of any authoritative exposition by the courts of Georgia upon this statute, but it is obvious that these courts, as the orphans' court in this State, are courts of special, and limited jurisdiction. The source of their power is found in the acts of the legislature creating them. From the authority there conferred, they derive their jurisdiction, and if no warrant can there be found for their acts, they are *coram non judice.*

It is evident the statute just cited, did not confer on the court of ordinary the right to direct the sale of slaves, as in its discretion it might think proper; nor did it have such power as an incident of granting letters of administration, but only in two contingencies—where the other personal property, together with the hire of the slaves for a year, was insufficient for the payment of the debts of the deceased, or when an equal division could not be made in kind among the distributees. As these are facts which the court could not judicially know, it necessarily follows, that it must act

upon the representation of the administrator, or of the distributees, or some of them, and this representation is its authority for entering upon an investigation of the facts, which may result in its judgment, that a sale is necessary, evidenced by its order, or decree directing a sale to be made. Unless the record discloses that a representation of the facts was made, by some one authorized to make it, the court was without jurisdiction, and could not enter upon the inquiry, whether a sale was necessary; for no principle is better settled, than that the jurisdiction of every court of special, and limited jurisdiction, must appear on the face of the proceedings. [Talliaferro v. Basset, 3 Ala. R. 670, and cases there cited.] The argument urged, that we must presume those things to have been done, without which the court of ordinary could not have directed the sale of the slaves, is at war with the entire current of authority, and would confound all the distinctions, between courts of general and those of limited jurisdiction.

If it appeared from the record, that a petition had been filed, either by one being found in the record, or the recital of the record, that the necessary representation had been made, every presumption in favor of the correct action of the court would be proper, when its judgment came collaterally in question; but we cannot presume the power of the court to act; that must appear from the record itself.

From the record it appears, that Martha M. Calhoun, and William King, were appointed administrators of the estate of David Calhoun, at the March term, 1827, of the court of ordinary for Franklin county, Georgia, and executed their bond as such, and at the same term of the court, the following order was made: "It is ordered by the court, that the administrator of David Calhoun proceed to sell, after advertising the same according to law, the following negroes belonging to said estate, to wit: Mike, Candice, and her three children, Mike, Green, and Isaac." There is then nothing shown upon this record, that the court had power to make this order, but it appears to have been considered by the court as an ordinary act of power, flowing from the grant of letters of administration. There is no citation to the heirs, or any evidence furnished by the record, that the court entered up-

on the inquiry, if we could presume the proper representation to have been made, whether a sale was necessary and proper.

This statute of the State of Georgia, appears to be entirely analagous to the statutes of this State, authorizing the orphans' court to order a sale of land, for the purpose of paying debts, or for more equal distribution among the heirs. Our statutes provide that this may be done, on the petition of the administrator, and citation to the heirs; or when commissioners appointed to make division, return that such division cannot be fairly and equitably made. In expounding these statutes, it has been held, that the jurisdiction of the court attached, when it acts upon the petition of the administrator and directs citation to the heirs—or when the court assumes to act upon such petition, reciting it, or upon the report of commissioners, that an equitable division cannot be made. [Campbell v. Wyman, and Couch & Robinson v. Campbell *supra*, and Duval's Heirs v. McLoskey, 1 Ala. R. 730; see also, Thompson v. Tolmie, 2 Peters, 157, and McPherson v. Cunliffe, 11 S. & R. 429.]

Our conclusion is, that as it does not appear, that the court of ordinary had jurisdiction to order a sale of these slaves, the administrator acquired no title by his purchase, but that they still remain the property of his intestate. This renders it unnecessary to inquire, what would be the effect under the law of Georgia, of an administrator purchasing at his own sale.

This was also the conclusion of the chancellor, and he correctly considered that these slaves and their increase were still liable to the distributive share of the complainant in his father's estate. To ascertain which, an account was necessary, and must be taken, of the administration of King, upon Calhoun's estate; one third part of the sum remaining in his hands for distribution being the distributive share of the complainant, subject to a deduction for all proper expenses incurred by King, in boarding, clothing, and educating him.

The defendants, purchasers from King pending this litigation, and having also express notice of the complainant's demand, are in no better condition than King; but, in our opinion, the chancellor erred in referring it to the master, to

McCartney, et al. v. Calhoun, et al.

ascertain after the account was taken, what sum each of these defendants should pay, and after making demand of them, to issue execution for the amount if not paid.    This was erroneous, because it deprived the defendants of the right of excepting to the account stated by the master, and to the apportionment made by him, among the several defendants, of the gross amount found due from King to the complainant. These acts were not ministerial merely, they involved the exercise of judicial power, and therefore the defendants could not be deprived of their right of exception, and appeal to the chancellor.

The bill is not multifarious.    As to the claim set up in the bill to the distributive share of J. C. Calhoun, it is sufficient to say, that Spence was the administrator both of the estates of King and J. C. Calhoun, and that these estates were so blended together, that they could not well have been separately considered, and all the defendants, as purchasers of the slaves as the property of King, were equally interested in both estates, as it respects the complainant's demand. The defendants having purchased the slaves as the property of King, have a common interest in resisting the complainant's equity.    It is no objection that they purchased under different judgments, as it is not necessary that their interest should be joint.    It is sufficient that they have an interest which is common to, or concerns them all.    [P. & M. Bank v. Walker, 7 Ala. R.  950.]    Besides it was proper to unite them all, that the loss might be properly apportioned among them.

It is proper to remark, to prevent misapprehension, that all questions relating to the account, and the principles upon which it should be stated, are designedly left open.    Let the decree be reversed, and the cause remanded for further proceedings.